# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**JAMES I. WARD,**

     **Plaintiff,**

     **v.**                                 **CIVIL ACTION NO. 1:11cv68**
                                                     **(Judge Keeley)**

**KUMA DEBOO, Warden;**
**ELLEN MACE-LEIBSON, Former**
**Health Services Clinical Director at FCI Gilmer;**
**DR. RAMIREZ, Regional Clinical Director;**
**DR. R. ALLEN, Chief of Health Programs, Central**
**Office; and Rendi Thomas, Medical Designator, Office**
**of Medical Designation and Transportation,**

     **Defendants.**

## REPORT AND RECOMMENDATION THAT COMPLAINT
## AND AMENDED COMPLAINT BE DISMISSED WITH PREJUDICE

### I. Factual and Procedural History

The *pro se* plaintiff initiated this civil rights action on May 4, 2011. In the complaint, the plaintiff alleged violations of his constitutional rights by Kuma Deboo, Warden of FCI Gilmer and Dr. Ellen Mace-Leibson, the former Health Services Clinical Director of the Federal Correction Institution in Gilmer, West Virginia (hereinafter "FCI Gilmer"), pursuant to Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388 (1971), a case in which the Supreme Court created a counterpart to 42 U.S.C. §1983, authorizing suits against federal employees in their individual capacities.

On August 29, 2011, the undersigned conducted a preliminary review of the file and determined that immediate dismissal of the plaintiff's claims against DeBoo and Mace-Leibson was not appropriate. Accordingly, an order to answer was entered.

1

On October 31, 2011, after service of the summons and complaint, defendants Mace-Leibson and Deboo filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment based on the plaintiff's alleged failure to state a claim upon which relief could be granted and qualified immunity.  On November 4, 2011, plaintiff filed a motion requesting an extension of time in which to respond and a Roseboro notice was issued.  By Order entered November 8, 2011, plaintiff's request for an extension of time was granted, giving him an additional sixty days in which to respond.  By Order granted November 30, 2011, plaintiff's November 29, 2011 motion for leave to exceed the page limitation was granted, specifying that his Roseboro response could contain no more than twenty-five pages.  On December 8, 2011, plaintiff moved to amend his complaint, seeking to add to this action an Americans with Disabilities Act ("ADA") violation and three additional defendants he alleged were responsible for it.  The defendant objected on December 16, 2011 and by Order entered December 22, 2011, plaintiff's motion to amend was denied on the grounds that there was no waiver of sovereign immunity by the ADA and the amendment would be futile.

On December 29, 2011, plaintiff filed a second motion to amend, seeking to add the same three additional defendants; defendants objected on January 4, 2012.  By Order entered on January 6, 2012, plaintiff's second motion to amend was granted, and defendants Dr. Ramirez, Regional Clinical Director; Dr. R. Allen, Chief of Health Programs, Central Office; and Rendi Thomas, Medical Designator, Office of Medical Designation and Transportation were added to the action.  Plaintiff filed his amended complaint on January 17, 2012.[1]

---

[1] Defendants Ramirez, Allen and Thomas have not been served.  Plaintiff's claims against them are being reviewed for an initial review and report  and recommendation pursuant to LR PL P 83.01, et seq., and 28 U.S.C. §§ 1915(e) and 1915(A).

## II.  Contentions of the Parties

### The Complaint and Amended Complaint

In the complaint, the plaintiff asserts that defendants Dr. Mace-Leibson and Deboo were deliberately indifferent to his serious medical needs and violated his Eighth Amendment right to be free from cruel and unusual punishment when they:

1)  failed to give him a musculoskeletal exam;

2)  ignored his Veterans' Administration ("V.A.") medical records that showed a pre-incarceration diagnosis of severe painful osteoarthritis, bone-on-bone contact with loss of cartilage, torn tissue, and deformity in his left leg, and resultant hip and back problems, with a recommendation for a total knee replacement;

3)  ignored the court's sentencing recommendation that he be confined near Martinsburg, West Virginia to consider his need for surgery;

4)  have only provided him with the most cursory of medical care since he has been incarcerated;

5)  denied him the opportunity to be seen by an orthopedic physician for a second opinion;

6)  refused to order him a wheel chair; and

7)  told him he needs to lose weight before they will consider providing him with knee replacement surgery.

Plaintiff's amended complaint alleges that:

7)  defendant Dr. Ramirez was deliberately indifferent to his serious medical needs and violated his Eighth Amendment right to be free from cruel and unusual punishment when he disregarded the recommendations of two orthopedic surgeons for plaintiff's knee replacement by denying plaintiff's requests for orthopedic surgery;

8)  defendant Dr. Allen was deliberately indifferent to his serious medical needs and violated his Eighth Amendment right to be free from cruel and unusual punishment when on two occasions, January 10, 2010 [sic] and October 19, 2011, he denied plaintiff's request for transfer to a medical referral center for orthopedic surgery;

9) defendant Rendi Thomas exhibited deliberate indifference to his serious medical needs and violated his Eighth Amendment right to be free from cruel and unusual punishment when she failed to designate him to a medical referral center for knee replacement, physical therapy and/or a weight loss program on October 19, 2011.

As relief, plaintiff seeks a court order directing the defendants to arrange for his total knee replacement, as well as an award of compensatory and punitive damages for pain, suffering, physical and mental anguish in the amount of Seven Million Dollars ($7,000,000.00).

## The Defendant's Mace-Leibson and DeBoo's Motion to Dismiss, or in the Alternative, for Summary Judgment

In response, the defendants Mace-Leibson and DeBoo assert that the plaintiff's complaint should be dismissed because he is not entitled to relief, for the following reasons:

a) he cannot establish a claim for deliberate indifference to his medical condition;

b) supervisory liability is inapplicable in a Bivens action;

c) the defendants are entitled to qualified immunity; and

d) the plaintiff is not entitled to injunctive relief because it is unlikely he will prevail on his claim because: he has not alleged a constitutional violation; cannot demonstrate the likelihood of irreparable harm; the balance of inequities does not favor him; and the public interest would not be served by the granting of a preliminary injunction.

In the alternative, the defendants impliedly assert that because of the supporting documentation accompanying their motion, there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law.

## The Plaintiff's Reply

Plaintiff reiterates his claims previously made and attempts to refute defendants Mace-Leibson and DeBoo's arguments.

## III. Standard of Review

## Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. <u>Mylan Labs, Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir.1993); <u>see also</u> <u>Martin</u>, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." <u>Conley</u>, 355 U.S. at 45-46. In <u>Twombly</u>, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Conley</u>, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," <u>Id</u>. (citations omitted), to one that is "plausible on its face," <u>Id</u>. at 570, rather than merely "conceivable." <u>Id</u>. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." <u>Bass v. E.I.DuPont de Nemours & Co.</u>, 324 F.3d 761, 765

(4th Cir.2003) (citing <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 213 (4th Cir.2002); <u>Iodice v. United States</u>, 289 F.3d 279, 281 (4th Cir.2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in <u>Ashcroft v. Iqbal</u>, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. <u>Id</u>.

**<u>Motion for Summary Judgment</u>**

Under the Federal Rules of Civil Procedure, summary judgment is appropriate, "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex</u> at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material

facts." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but … must set forth specific facts showing that there is a genuine issue for trial." Anderson at 256. The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is properly only "[w]here the record taken as a whole could not lead a rational trier of fact to find the nonmoving party." Matsushita at 587 (citation omitted).

## IV. Analysis

### Supervisor Liability Inapplicable in a *Bivens* Action

Liability in a Bivens case is "personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.2d 391, 402 (4th Cir. 2001)(internal citation omitted). Thus, in order to establish liability in a Bivens case, a plaintiff must specify the acts taken by the defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2nd Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663 (3rd Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zeitler v. Wainwright, 802 F.2d 391, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for a violation of a constitutional right in a Bivens case. Rizzo v. Good, 423 U.S. 362 (1976).

Plaintiff appears to be generally alleging that defendant DeBoo, along with defendant Mace-Leibson, failed to give him a musculoskeletal exam; ignored the VAMC's diagnosis of

severe osteoarthritis and its recommendation for knee replacement; only provided him with the most cursory of medical care; denied him a second orthopedic opinion; refused to order him a wheel chair; and told him needed to lose weight before the BOP would consider providing him with knee replacement surgery. However, plaintiff has made no specific allegation against defendant DeBoo as to any of these claims. Further, DeBoo is a Warden, not a medical provider. While the plaintiff claims his repeated requests for specific medical or surgical procedures were denied, he has not provided any evidence to show it was DeBoo denying his requests. Further, the undersigned notes that the Fourth Circuit has held that non-medical personal may rely on the opinion of medical staff regarding the proper treatment of inmates. Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990). Thus, the defendant DeBoo could rely on the opinion of the defendant Mace-Leibson and other BOP medical providers as to whether the plaintiff actually needed additional medical or surgical care.

Here, because plaintiff does not allege any personal involvement on the part of Warden DeBoo, it appears that plaintiff has named her as defendant only in his official capacity as the Warden of FCI Gilmer. However, a suit against government agents acting in their official capacities is considered a suit against the United States itself. See Kentucky v. Graham, 473 U.S. 159, 165 (1985) ("Official-capacity suits...'generally present only another way of pleading an action against an entity of which an officer is an agent.').

Nonetheless, in Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990), the Fourth Circuit recognized that supervisory defendants may be liable in a Bivens action if the plaintiff shows that: "(1) the supervisory defendants failed to provide an inmate with needed medical care; (2) that the supervisory defendants deliberately interfered with the prison doctors' performance; or

(3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians'

constitutional violations."  In so finding the Court recognized that [s]upervisory liability based

upon constitutional violations inflicted by subordinates is based, not upon notions of *respondeat*

*superior*, but upon a recognition that supervisory indifference or tacit authorization of

subordinate misconduct may be a direct cause of constitutional injury." Id.  However, a plaintiff

cannot establish supervisory liability merely by showing that a subordinate was deliberately

indifferent to his needs. Id.  Rather, the plaintiff must show that a supervisor's corrective inaction

amounts to deliberate indifference or tacit authorization of the offensive practice.  Id.  This

plaintiff has not done.

As for plaintiff's allegation that both defendant DeBoo and Mace-Leibson ignored the

sentencing court's July 15, 2009 recommendation that he be incarcerated as near to Martinsburg,

West Virginia as possible, in order to accommodate his need for possible orthopedic surgery,

setting aside for the moment that it is the Bureau of Prisons that determines where a given inmate

is incarcerated, not prison wardens or BOP medical providers, the sentencing court did not *direct*

anyone to provide plaintiff with the surgery he is seeking.  The sentencing court merely made a

recommendation "[t]hat the defendant be incarcerated at an FCI or a facility as close to

Martinsburg, West Virginia, as possible, while considering the defendant's need for medical

treatment and possible need for surgery."  (Dkt.# 53-4 at 2) (emphasis added).  The court made

no finding that plaintiff *required* surgery, merely noted that there was a possibility he might need

it and recommended BOP placement to try to accommodate that possibility.  It is well

established that an inmate has no right to be housed in any particular facility.  Meachum v. Fano,

427 U.S. 215 (1976).  Thus, plaintiff cannot assert that any of his federal rights were violated

when the BOP did not incarcerate him at the facility of his choosing. Moreover, because neither DeBoo nor Mace-Leibson had anything to do with deciding where plaintiff was incarcerated, they cannot be faulted in this regard. Accordingly, plaintiff has failed to state a claim upon which relief can be granted against either of them and this claim should be dismissed.

In this case, the plaintiff has not provided any evidence that Warden DeBoo tacitly authorized or was deliberately indifferent to an alleged violation of his constitutional rights. Moreover, to the extent that the plaintiff may be asserting that the Warden was deliberately indifferent to his needs by denying his administrative grievances, that claim is also without merit because that is not the type of personal involvement required to state a Bivens claim. See Paige v. Kuprec, 2003 W.L. 23274357 *1 (D.Md. March 31, 2003). Therefore, defendant DeBoo should be dismissed from the case. Furthermore, to the extent that the Court should be inclined to liberally interpret the plaintiff's designation of the defendant in this action, for the reasons stated below, he has failed to allege any claim that amounts to a violation of his 8th Amendment right to adequate medical care.

**Defendant Mace-Leibson**

To state a claim under the Eighth Amendment, plaintiff must show that defendants acted with deliberate indifference to serious medical needs of a prisoner. Estelle v. Gamble, 429 U.S. 97, 104 (1976). A cognizable claim under the Eighth Amendment is not raised when the allegations reflect a mere disagreement between the inmate and a physician over the inmate's proper medical care, unless exceptional circumstances are alleged. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove two elements: (1) that objectively, the deprivation of a basic human need was sufficiently serious, and (2) that subjectively, the prison official acted with a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 298 (1991). When dealing with claims of inadequate medical attention, the objective component is satisfied by a serious medical condition.

A medical condition is "serious" if "it is diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir.1990), *cert. denied*, 500 U.S. 956 (1991); Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir.1987) *cert. denied*, 486 U.S. 1006 (1988).[1]

A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth 834 F.2d at 347. Thus, while failure to provide recommended elective knee surgery does not violate the Eighth Amendment, Green v. Manning, 692 F.Supp. 283 (S.D. Ala.1987), failure to perform elective surgery on an inmate serving a life sentence would result in permanent denial of medical treatment and would render the inmate's condition irreparable, thus violating the Eighth Amendment. Derrickson v. Keve, 390 F.Supp. 905,907 (D.Del.1975). Further, prison officials must provide reasonably prompt access to elective

---

[1] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997).

surgery. <u>West v. Keve</u>, 541 F. Supp. 534 (D. Del. 1982) (Court found that unreasonable delay occurred when surgery was recommended in October 1974 but did not occur until March 11, 1996.)

The subjective component of a cruel and unusual punishment claim is satisfied by showing deliberate indifference by prison officials. <u>Wilson</u>, 501 U.S. at 303. Deliberate indifference entails something more than mere negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. <u>Farmer v. Brennan</u>, 511 U.S. 825, 835 (1994). Basically, a prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. <u>Farmer</u>, 511 U.S. at 837. A prison official is not liable if he knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial or nonexistent. <u>Id</u>. at 844.

While, the plaintiff's knee condition is sufficiently serious to meet the objective component, the Fourth Circuit requires not only that the condition be serious, but also that a prisoner provide evidence that his condition was not timely or properly treated. <u>Harden v. Green</u>, 27 Fed. Appx. 173, 178 (4th Cir. 2001)("The objective element also requires [the prisoner] to prove that his serious medical need was not timely or properly treated."); <u>Clinkscales v. Pamilco Correctional facility Medical Dept.</u>, No. 00-6798, 2000 WL 1726592 *1 (4th Cir. Nov. 21, 2000).

Although the plaintiff claims that the defendant Mace-Leibson failed to give him a musculoskeletal exam; ignored the VAMC's diagnosis of severe osteoarthritis and its recommendation for knee replacement; only provided him with the most cursory of medical care;

denied him a second orthopedic opinion; refused to order him a wheel chair; and told him needed to lose weight before the BOP would consider providing him with knee replacement surgery, a review of the record and the evidence submitted by the defendant clearly establishes the contrary. It also establishes that the plaintiff's medical condition has been timely and properly treated.

When plaintiff arrived at FCI Gilmer on August 6, 2009 his medical records showed a history of hypertension; infectious disease; emotional abuse; bipolar disorder with two previous suicide attempts and several inpatient mental health admissions; bilateral painful osteoarthritis in knees, with a prior ACL tear from injuries in football and in military service; painful front teeth and molars; and that he was using a left knee brace and arch supports from the VA. He smoked ½ pack of cigarettes daily for fifteen years, weighed 300# and was 6'5" tall. He had a surgical history of a temporary colostomy after a gunshot wound, gallbladder surgery, and had been hospitalized once for cellulitis of the right hand.

He had recently[2] had an orthopedic surgery consultation visit at the Martinsburg, West Virginia Veterans Administration Medical Center ("VAMC"); advanced osteoarthritis primarily of the lateral and patellofemoral compartments of the left knee, and an "ACL deficient left knee with previous ACL reconstruction and reinjury"[3] were found.[4] The day before that orthopedic

---

[2] The date of the visit was April 30, 2009.

[3] The "ACL" is the anterior cruciate ligament of the knee, which connects the bottom of the thigh bone with the top of the shin bone by running crosswise inside the center of the knee joint, behind the knee cap, providing stabilization to the knee.

[4] The physician's assistant who performed the exam recommended an MRI be performed and opined that "I do not feel like an ACL reconstruction is appropriate for this patient and he should either be managed conservatively with interarticular therapy using steroids or HA therapy and weight loss with PT and/or arthroplasty. . ." Further, he noted "[a]ny lifestyle changes (DIET, SMOKING, ECT.) that could improve the veterans' [sic] health and welfare were discussed carefully with him, and recommendations for implementing those changes were made, with his full understanding." (Dkt.# 33-1 at 2).

visit, lumbar spine x-rays showed mild narrowing of the disc height at L5-S1, suggesting mild disc disease. On June 15, 2009, the MRI of his left knee was performed.  The radiology report noted that plaintiff's weight was 286.6# and he had a prior history of meniscal tears.  The MRI found "abnormal signals in the tunnels of the tibial as well as femoral components of the ACL reconstruction graft.  While the graft fibers itself [sic] are visualized and appear intact, graft dysfunction is suspected." (Dkt.# 33-1 at 3-4). Further, the report noted that there was a large joint effusion in the knee, with marked cartilage abnormalities in all three compartments of the knee, with chronic medial as well as lateral meniscal tears.  (Dkt.# 33-1 at 5). Plaintiff also had cervical spine x-rays performed on June 30, 2009, which showed moderate degenerative disc disease at C5-C6 and C6-C7.  (Dkt.# 33-1 at 3).[5]   According the VA, plaintiff's medical history, in addition to the knee condition, also included bipolar disorder, considered to be under control with regular medication and follow up, and a prior history of substance abuse.

On August 6, 2009, plaintiff had a "new inmate" clinical encounter at FCI Gilmer; the note of the visit indicated his regular medications were Risperidone, Divalproex, Acetaminophen, Ibuprofen, Omeprazole, and Hydroxyzine Pamoate as needed for agitation.[6]

---

[5] All radiological studies were performed at the Martinsburg, West Virginia VAMC.

[6] Risperidone (Risperdal) is an antipsychotic medication used to treat mental illnesses including schizophrenia, bipolar disorder, and irritability associated with autistic disorder.  Divalproex sodium is an anti-seizure drug, also used to treat bipolar disorder and to help prevent migraine headaches. It is sold under multiple brand names in the United States, including Depacon, Depakene, Depakote, and Depakote Sprinkle.  Acetaminophen is the generic form of Tylenol, an over-the-counter pain reliever.  Ibuprofen is the generic name of Motrin, an over-the-counter, non-steroidal anti-inflammatory ("NSAID") pain reliever. Omeprazole is the generic name of Prilosec, an over-the-counter medication used to treat gastro-esophageal reflux disease ("GERD"), a condition in which backward flow of acid from the stomach causes heartburn and possible injury of the esophagus, or to protect the stomach lining when frequent use of NSAIDs are necessary.  Hydroxyzine Pamoate is the generic name for Vistaril, an antihistamine used for the short-term treatment of nervousness and tension that may occur with certain mental/mood disorders such as anxiety or dementia, to relieve itching from allergies and drug reactions, pre- or post-operatively for its calming effect, or to help potentiate the action of certain narcotic pain relievers.

The sworn declaration of Dominick McLain, D.O. (Dkt.# 32-1 at 1-7), a physician at FCI Beckley indicates that in April 2009, prior to plaintiff's incarceration, he was evaluated by the VAMC to determine if the previously-grafted anterior cruciate ligament ("ACL") in his left knee was deficient. Plaintiff reported to the VAMC that that he was wearing his ACL knee brace most of the time, taking ibuprofen for pain, and indicated interest in having knee replacement surgery. The VAMC's orthopedic exam revealed a swollen left knee, with full extension and flexion of 90 degrees, but excessive anterior-posterior motion and positive Lachman and anterior drawer tests.[7] Plaintiff was diagnosed with advanced osteoarthritis, primarily involving his left knee's lateral and patellofemoral compartments. The VAMC recommended conservative treatment with inter-articular therapy using steroids, or intra-articular therapy, using hyaluronic acid ("HA") therapy, weight loss, physical therapy and/or knee replacement surgery.

Dr. McLain further averred that the plaintiff was taken into the BOP's custody on July 30, 2009, arriving at FCI Gilmer on August 6, 2009, where he underwent an initial medical screening that day. He reported having bilateral knee pain, and that he had suffered an ACL tear from football and injuries in the military, and stated he needed total knee replacement. It was noted that he had a knee brace and arch supports.[8] On August 12, 2009, plaintiff had his BOP history and physical exam. He reported knee pain and again stated he needed a knee replacement. His osteoarthritis diagnosis was noted and he was prescribed acetaminophen four

---

[7] The Lachman and anterior drawer tests are tests done to determine the condition of the ACL.

[8] The records also indicate he had a cane. (Dkt.# 33-1 at 22).

times daily; 400 mg ibuprofen three times daily; and Capsaicin topical cream three times daily.[9] His weight at that time was 300#. [10]

Plaintiff was seen in Health Services again on September 4, 2009, when he requested placement in a handicapped cell so that he could have a bunk that was higher off the ground, more room in the cell, and a toilet with bars to assist him in arising. He was moved to a handicapped cell that day.

On September 21, 2009, upon a report that plaintiff had fallen in his housing unit, Health Services was called to see him. They found him lying on the floor, complaining of neck and left knee pain. He was not wearing his knee brace and he did not have his cane with him. He was taken to Health Services on a backboard; x-rays were negative for any acute injury. His gait was completely normal after the exam[11] and he ambulated down the hall and back to his unit afterwards without instability or sign of significant pain.

The Health Services Clinical Encounter records for this incident indicate that when Dr. Mace-Leibson first arrived to examine him after his fall, plaintiff announced "I got my VA records today." (Dkt.# 33-1 a 28). When Mace-Leibson questioned the absence of his knee brace and cane, plaintiff reported that he did not use them when walking around in the unit, only

---

[9]  The records also indicate that Dr. Mace-Leibson performed his history and physical. Plaintiff's Risperdal was discontinued, presumably because he complained of "cotton mouth" from taking it. (Dkt.# 33-1 at 14). He was placed on a new medication, Citalopram 40 mg daily. (Dkt.# 33-1 at 23). Citalopram (brand name Celexa) is in a class of antidepressants called selective serotonin reuptake inhibitors (SSRIs). It works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. His valproic acid was continued. Numerous lab tests were ordered: a lipid profile, urinalysis, metabolic profile, hepatic profile, thyroid stimulating hormone level, a complete blood count, including a white blood count and differential. (Dkt.# 33-1 at 23). He was scheduled for follow-up in the Chronic Care Clinic in six months, with follow-up at Sick Call as needed. He was counseled as to his plan of care and new medications and instructed on how to obtain medical, dental, and mental health care by Mace-Leibson. (Dkt.# 33-1 at 24).

[10]  Plaintiff's abdomen was noted to be "obese" on that exam. (Dkt.# 33-1 at 22).

[11] The records reveal that defendant Mace-Leibson performed a musculoskeletal exam on plaintiff after his fall. (Dkt.# 33-1 at 28).

when out on the yard. Further, the records note that plaintiff was overheard by officers and "LT" talking on the phone to his family earlier that day, telling them he was "going to fake falling out so that he could get sent to hospital [sic]." (Dkt.# 33-1 at 28). Dr. Mace-Leibson's notes reflect that during her exam, the plaintiff "continued to talk about 'following the procedure to get knee replacement' and while he did not say it outright, indicated that this whole 'emergency' was performed by him to get what he wanted." (Dkt.# 33-1 at 29). Apparently, after his x-rays were reported to him as negative, plaintiff told Mace-Leibson "I know I'm fine," and proceeded to ask about knee replacement, how long it would take to get his VA records reviewed and how soon he could be transferred elsewhere for the surgery, etc., stating "I just want to get this done." (Dkt.# 33-1 at 29).

Dr. McLain's declaration indicates that on October 22, 2009, plaintiff was again evaluated by Health Services, this time for complaints of knee pain that interfered with his sleep. Plaintiff reported that he was only getting 2-3 hours of sleep each night, and again requested knee replacement surgery as soon as possible. He was given a prescription for 75 mg of Amitriptyline, and a referral to the Utilization Review Committee ("URC") was made, to determine whether an orthopedic surgery consult was warranted, based on the VAMC medical records.

On November 6, 2009, Health Services received a sick call slip from plaintiff, complaining that the Amitriptyline was too strong; it was decreased to 50 mg.

On November 10, 2009, upon the recommendation of the URC for an orthopedic surgery consult, a request was made to the Mid-Atlantic Regional Medical Director for approval of the consult.

On November 18, 2009, the Regional Medical Director deferred the request for an orthopedic consult, recommending instead that the case first be discussed with the orthopedic department at the Federal Medical Center ("FMC") Butner, North Carolina, for a potential transfer to that facility.

On November 24, 2009, plaintiff complained that the Amitriptyline dose was still too strong; consequently, the dose was decreased to 25 mg at bedtime.

On January 4, 2009, a Medical Referral/Transfer Request was submitted by FCI Gilmer to the BOP Central Office, for plaintiff's transfer to FMC Butner's orthopedic program. Shortly thereafter, plaintiff was temporarily transferred out of FMC Gilmer on a writ. He returned on January 19, 2010 and was again screened in Health Services. No significant changes were noted and his medications were continued. He was placed on restricted medical duty status, again given a lower bunk in a handicapped cell due to his knee problems and his size, and was restricted from participation in sports. Work restrictions were also made to accommodate his knee condition.

Plaintiff was seen on March 23, 2010 for his Chronic Care appointment. Dr. McLain explains in his affidavit that the Chronic Care Clinic is a method used by the Bureau of Prisons to manage the health care of inmates with chronic health conditions on a regular basis. Inmates enrolled in the chronic care clinic program are seen by staff physicians on at least a three - six month basis for monitoring of their health conditions. (Dkt.# 33-1 at 3-4). At that appointment, plaintiff requested a wheelchair, different shoes, and again requested knee replacement surgery. An exam revealed that his gait was unchanged from his previous exam, described as "rather normal" except for some favoring of the left knee. He was given teaching on diet, weight loss

and the need to lose weight in order for the knee replacement surgery to be considered. He was offered the wheelchair but declined in favor of taking a "spin" class, a non-impact way of exercising while sitting on a stationary bike. He was advised to pursue non-impact exercise, lose weight, and use his cane. He was given inserts for his shoes. He was informed that the Central Office had denied his request for knee replacement surgery because his weight exceeded the weight limit of the mechanical knee. The limitations of the design of that knee were carefully explained to him. At that time, plaintiff's weight was 331#.

On June 18, 2010, plaintiff was seen again in Chronic Care Clinic. He expressed anger at being denied a medical transfer and knee replacement surgery. During the exam, it was observed that he was able to get up and down from a chair and the exam table without significant difficulty, and that his gait was essentially normal. Further, it was noted that as he was leaving, he carried his papers, socks and cane in his hand, walking quickly without the aid of the cane, showing no signs of disability, pain or instability.

On September 14, 2010, plaintiff was seen again in Chronic Care Clinic. He requested an orthopedic surgery referral to assess any change from the prior year, and again requested knee replacement surgery. During the examination, it was noted plaintiff could get up and down from the exam table and a chair, and remove his shoes and socks without difficulty. He left his cane by the chair and walked across the exam room to the exam table without any sign of discomfort or instability. After the exam, he appeared angry. He jumped down from the exam table, slipped his shoes on without his socks, and walked quickly down the hall without difficulty, carrying his cane and socks. When he realized he was being observed, he began using the cane, but it was

noted that he barely made contact with the floor while using it. His medical duty restrictions were continued.

On April 5, 2011, plaintiff had his next Chronic Care Clinic visit. An x-ray of his knee was ordered and a request to the URC for referral to an orthopedic specialist was begun, to determine whether knee surgery was possible. His weight that day was 335#. The following day, his restricted medical duty status was continued. On April 7, 2011, the orthopedic consult request was recommended by the URC, and was referred to the BOP's Mid-Atlantic Regional Quality Management Control Coordinator for approval. The x-ray of plaintiff's knee was taken on April 8, 2011; it showed severe osteoarthritis and a single large anchor screw in the medial proximal tibia.

On April 15, 2011, an administrative note was made in plaintiff's health record, documenting the approval by the Mid-Atlantic Regional Quality Management Control Coordinator of the request for an orthopedic consult.

On June 28, 2011, the plaintiff was transferred out of FCI Gilmer to FCI Beckley. He was screened in FCI Beckley's Health Services the same day; his restricted medical duty and medications were continued.

On July 19, 2011, the plaintiff had his Chronic Care Clinic appointment. His weight was 320#. It was noted that because approval had previously been obtained for the orthopedic consult by FCI Gilmer, an appointment for the same would be scheduled.

Dr. McLain avers that the plaintiff was evaluated by an orthopedic surgeon on July 28, 2011. The surgeon reviewed his VAMC records and noted that the VAMC had encouraged

plaintiff to wait till he was in his late 50s[12] to have the total knee replacement. However, in view of plaintiff's reported discomfort, and his need for a cane to ambulate, the orthopedist recommended that plaintiff be referred to a medical center where he could undergo knee replacement. Further, he advised plaintiff to wear his knee brace at all times when up moving about.

On August 26, 2011, plaintiff was seen in Health Services, requesting ibuprofen for left knee pain. He was prescribed 800 mg ibuprofen twice daily and a request was made to URC to approve the knee replacement surgery. An administrative note was made into his health records summarizing the findings of his June 2009 MRI and the July 2011 orthopedic exam with its recommendation for the surgery, noting plaintiff's difficulty with exercise due to knee instability and pain, and further noting "[o]ne issue to consider though is his weight of 320#." The consultation request was completed that day. At that time, plaintiff's Body Mass Index ("BMI") was noted to be 37.9.[13]

On August 30, 2011, the URC forwarded the orthopedic surgery request to the Regional Medical Director for approval. It was denied on September 29, 2011, with a note that plaintiff's high BMI would result in the failure of the tibial plateau portion to the total knee replacement, and it included a recommendation that plaintiff be considered for a transfer to a medical center for physical therapy and weight loss.

On October 30, 201, a request for plaintiff's transfer to a BOP medical center was submitted. It was denied on October 19, 2011, by the BOP's Chief Health Physician in the

---

[12] As of July 27, 2011, the plaintiff was 48 years old. (Dkt.# 33-1 at 97).

[13] A normal adult BMI, neither under- nor overweight, is considered to fall between 18.5 – 24.9. http://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html.

BOP's Central Office in Washington DC, with a recommendation that plaintiff first lose weight, noting that a transfer request would be reconsidered, once the weight loss was accomplished.

Finally, Dr. Mclain's declaration avers that plaintiff's weight and BMI both exceed the limitations for a mechanical knee, and plaintiff has been treated with appropriate accommodations and medications, the only treatment options available under the circumstances. Further, he avers, and the records confirm, that plaintiff has been repeatedly examined and provided continuous treatment.

Defendant Dr. Mace-Leibson also provided her own sworn declaration. In it, she avers that she is a board-certified family physician and was the Clinical Director at FCI Gilmer during the time relevant to this action. She reports that she was a member of FCI Gilmer's URC, which meet weekly to discuss possible inmate referrals to outside facilities and/or providers, and that she participated in the approval and denial of those referrals. She denies plaintiff's allegation that she was deliberately indifferent to his knee condition, and states that plaintiff's weight and BMI both exceed the limitations of the mechanical knee he sought, and consequently, she provided the only appropriate alternative treatments available under the circumstances.

Here, at best, the plaintiff's challenge to Dr. Mace-Liebsen's medical care appears to be a challenge to her determination that he is not a candidate for total knee replacement unless and until he loses weight. Aside from his bald assertion, the plaintiff has provided nothing which would provide this court with a basis to second-guess the care the plaintiff received.

With respect to the plaintiff's allegation that he has been denied a "musculoskeletal exam," the attached medical records indicate he was given musculoskeletal exams on many occasions: August 12, 2009; September 4, 2009; after his fall on September 21, 2009; October

22, 2009; March 23, 2010; June 18, 2010; September 14, 2010; April 5, 2011; July 19, 2011; July 28, 2011; and August 26, 2011. This claim lacks merit and should be dismissed for failure to state a claim upon which relief can be granted.

As for plaintiff's allegation that the defendants denied his request for wheelchair, Dr. Mclain's affidavit and the attached medical records indicate that when the wheelchair was offered, plaintiff refused it in favor of "spin" classes.[14]

Similarly, as for plaintiff's allegation that Dr. Mace-Leibson denied his request for a second orthopedic surgery opinion and his request for knee replacement surgery, these claims lack merit. It is clear from a review of the record that Dr. Mace-Leibson, as a member of the URC, referred plaintiff on April 5, 2011 for an orthopedic "second opinion," and on August 30, 2011, referred him for the orthopedic surgery recommended by that orthopedic surgeon. Because Dr. Mace-Leibson had no power to actually *grant* the requests, she cannot be faulted if they were denied by others. Moreover, plaintiff's request for the orthopedic second opinion *was* granted; plaintiff was seen by the orthopod on July 28, 2011. However, his request for the orthopedic surgery was denied by the BOP's Regional Medical Director. Because Dr. Mace-Leibson did not make the determination of whether the surgery would be provided, she cannot be held responsible under any theory of supervisory liability, and plaintiff has failed to state a claim upon which relief can be granted.

Nor does the record prove that Mace-Leibson (or any other defendant) ignored plaintiff's Veterans' Administration ("V.A.") pre-incarceration diagnosis of severe painful osteoarthritis

---

[14] The records of this March 23, 2010 visit to Health Services indicate that because of his size, there was no wheelchair large enough to comfortably accommodate plaintiff. Plaintiff had just been given D-Soles size D to put inside his shoes for his complaints of "flat feet" and "too hard" shoes. After finding no wheelchair that comfortably fit him, plaintiff "reported that he was doing well with the [new] insoles and cane now and that he was going to get into spin class and start dieting to decrease his weight." (Dkt.# 33-1 at 47 and 51).

with a recommendation for a total knee replacement. The record is replete with instances where the BOP medical providers referenced the earlier exam by the BOP. Merely because plaintiff did not obtain the outcome that he wanted does not establish that prison officials knew of and deliberately disregarded a substantial risk to his health.

Further, the records indicate that plaintiff has continued to steadily gain weight instead of losing it, despite being advised of the necessity to lose weight as early as April 2009, when seen by the VAMC. That advice was continually given throughout his incarceration, because the mechanical knee plaintiff sought would fail under the stress of bearing his excessive weight.[15] His medical records indicate that he was so obese, he could not cut his own toenails, and required Health Services to do that for him regularly.[16] Despite being repeatedly advised on his diet and the need for weight loss to prevent a future potential mechanical knee from failure, plaintiff has been non-compliant with the recommendations. Further, his refusal to use the cane and knee brace while ambulating, his ability to ambulate well without apparent need for those aids, taken with his obvious attempt to manipulate medical staff into providing the surgery by faking a fall, indicate to the undersigned that that plaintiff's complaints of knee pain may not be as severe as he presents them to be. The defendants' and other BOP medical providers' recommendation that plaintiff continue to pursue non-surgical means of treating his knee condition until such time as he reduces his weight to obtain a more optimal surgical outcome seems reasonable.

---

[15] At the time of plaintiff's VAMC MRI on June 15, 2009, his weight was 286.6#; he was already considered too overweight to receive the mechanical knee and was counseled to lose weight. By the time he arrived at FCI Gilmer on less than two months later on August 6, 2009, he had already put on another 14 pounds, bringing his weight to 300#. He continued to gain weight, and by April 5, 2011, he weighed 335#.

[16] The undersigned notes that plaintiff's needs for special arch supports, a wheelchair, and the discomfort in his knees can only be worsened by the burden of the extra weight he carries.

The Fourth Circuit Court of Appeals has held that:

Court will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment....[which] remains a question of sound professional judgment.

Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977).

The medical records submitted by the defendant demonstrate that the plaintiff was provided regular, continuous and appropriate medical care under the circumstances, and that there has never been an intentional interference with a prescribed course of treatment. Accordingly, nothing in the record shows that the plaintiff's knee condition was not timely or properly treated. Therefore, the plaintiff has failed to meet the objective component as required by the Fourth Circuit. Nor can he meet the subjective component. To establish deliberate indifference, the plaintiff must show that prison officials knew of and disregarded a substantial risk to his health. Farmer v. Brennan, 511 U.S. 825, 833-34 (1994). Medical staff may be found to be deliberately indifferent by intentionally denying or delaying access to medical care or by intentionally interfering with a prescribed course of treatment. Estelle, *supra* at 104-05. The record as a whole disputes plaintiff's claim that he was only provided "cursory" medical care by the defendants. The attached medical records make it clear that plaintiff was seen regularly in the Chronic Care Clinic for multiple health issues: his medications were titrated according to his reports of side effects; new medications were added and others discontinued when appropriate; he was given multiple and prompt accommodations for his particularized needs; he was repeatedly provided with health teaching on a variety of issues; and was repeatedly seen in Health Services whenever the need arose.

Despite the plaintiff's attempt to characterize his claim as one of deliberate indifference, it is clear from the plaintiff's medical records that the defendants have not been indifferent to his needs, deliberate or otherwise. Rather, it is clear that the plaintiff's complaints of pain have all been thoroughly, and in the undersigned's opinion, promptly evaluated and treated. It appears then, that the plaintiff really takes issue with the type of treatment he received. In other words, the plaintiff merely disagrees with the prison's medical staff as to his diagnosis or course of treatment. However, such a claim is more appropriately a tort claim and, as already noted, does not rise to the level of a constitutional violation. Wright v. Collins, *supra*. Accordingly, the plaintiff has failed to state a claim for which relief may be granted and the defendant Mace-Leibson is entitled to judgment as a matter of law.

## VI.  Amended Complaint

## Defendant Drs. Ramirez and Allen and Defendant Rendi Thomas

### Standard of Review

Because plaintiff is a prisoner seeking redress from a governmental entity or employee, the Court must review the complaint to determine whether it is frivolous or malicious. Pursuant to 28 U.S.C. § 1915A(b), the Court is required to perform a judicial review of certain suits brought by prisoners and must dismiss a case at any time if the Court determines that the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief against a defendant who is immune from such relief. Complaints which are frivolous, or malicious, must be dismissed. 28 U.S.C. 1915(e).

### Analysis

Plaintiff alleges that Dr. Ramirez was deliberately indifferent to his serious medical needs and violated his Eighth Amendment right to be free from cruel and unusual punishment when he disregarded the recommendations of two orthopedic surgeons for plaintiff's knee replacement by denying plaintiff's requests for orthopedic surgery, and that Dr. Allen was likewise deliberately indifferent in violation of his Eighth Amendment rights when, on two occasions, January 10, 2010[17] [sic] and October 19, 2011, he denied plaintiff's request for transfer to a medical referral center for orthopedic surgery. Further, plaintiff alleges that defendant Rendi Thomas was deliberately indifferent to his serious medical needs when she failed to designate him to a medical referral center for knee replacement, physical therapy and/or a weight loss program.

A review of the record reveals that on September 29, 2011, Dr. Ramirez disapproved of an August 30, 2011 referral for a request for knee replacement surgery saying

> BMI 37.9 – BMI will need to drop – BMI elevation results in failure of the tibial plateau portion of the TKR – consider 770 for PT and weight loss

Dkt.# 59-1 at 2.

Further review of the records indicates that on January 6, 2010, a Memorandum was issued from the Office of Medical Designations and Transportation Central Office, stating

> We have reviewed your referral of January 4, 2010 which requested a transfer to a Medical Referral Center for the above-named inmate. **Your request is denied at this time per Dr. Allen, Chief Health [sic] Programs, HSD**. Please manage locally with non-surgical treatments including pain management, ambulatory assistance devices (e.g. cane, walker), and especially weight loss. A transfer request may be reconsidered once he has achieved clinically significant weight loss.

(Dkt.# 59-2 at 1)(emphasis added).

---

[17] The denial plaintiff appears to be referring to occurred on January 6, 2010, not January 10, 2010. (Dkt.# 59-2 at 1).

Again, on October 19, 2011, plaintiff alleges that defendant Thomas ("Ms. Thomas") and Dr. Allen were deliberately indifferent to his serious medical needs, and violated his Eighth Amendment right to be free from cruel and unusual punishment. Plaintiff contends that Dr. Allen denied his request for a referral to a Medical Referral Center and Ms. Thomas failed to designate him to a medical referral center for knee replacement, physical therapy and/or a weight loss program, in a Memorandum For Chief Executive Officer at FCI Beckley, noting that FCI Beckley's request to transfer plaintiff to a Medical Referral Center was

> . . . denied at this time per Dr. Allen, Chief Health Programs [sic], Health Services Division. Please work with inmate to encourage weight loss. A transfer request can be reconsidered once that is accomplished.

(Dkt.# 33-1 at 110).

Plaintiff's allegations of deliberate indifference against Drs. Ramirez and Allen, although satisfying the objective component of a sufficiently serious condition, fail to prove that his condition was not timely or properly treated. Harden, *supra* at 178. Nor can plaintiff satisfy the subjective component of a cruel and unusual punishment claim. Plaintiff has shown neither negligence on the part of these defendants, let alone that they committed acts or omissions for the very purpose of causing him harm, or with knowledge that harm would result. Farmer v. Brennan, *supra* at 835. None of these defendants denied plaintiff's knee surgery or his transfer to a different facility for the purpose of causing harm. The records make it clear that there was a valid medical reason that plaintiff's request for surgery was denied; his morbid obesity would preclude a successful outcome to the surgery.[18] Plaintiff has failed to state a claim upon which

---

[18] Although plaintiff likely would be unwilling to accept it, the defendants are probably protecting him from even greater harm, by refusing to proceed surgically when a good outcome is precluded.

relief can be granted against these two defendants, and summary dismissal of his claims against them is appropriate.

Moreover, it is apparent that Ms. Thomas, who clearly is not a medical provider, had no actual authority to designate plaintiff to a Medical Referral Center herself. Rather, it is clear that the decision to deny the transfer was made by Dr. Allen, the Chief of Health Programs. Ms. Thomas cannot be faulted for merely transmitting this message. Plaintiff has failed to state a claim upon which relief can be granted against Ms. Thomas, and she should be dismissed from this action.

Thus, the plaintiff has not carried his burden under Rule 56 (c), and the defendants' motion for summary judgment should be granted.

## VI. Recommendation

For the reasons stated herein, the undersigned recommends that the defendants DeBoo and Mace-Leibson's Motion to Dismiss, or in the Alternative, for Summary Judgment (Dkt.# 31) be **GRANTED** and the plaintiff's complaint be **DISMISSED with prejudice**. Further, the undersigned recommends that plaintiff's claims against defendants Ramirez, Allen, and Thomas in his Amended Complaint (Dkt# 59) be **DISMISSED with prejudice** under 28 U.S.C. §§ 1915(e) and 1915A for failure to state a claim.

**Within fourteen (14) days** after being served with a copy of this recommendation, any party may file with the Clerk of the Court written objections identifying the portions of the recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a**

**judgment of this Court based upon such Recommendation**. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as reflected on the docket sheet, and to any counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Dated: January 18, 2012

s/s *James E. Seibert*
James E. Seibert
UNITED STATES MAGISTRATE JUDGE
